UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZIMRAN,<br><br>Petitioner,<br><br>v.<br><br>KRISTI NOEM, Secretary of<br>Homeland Security, et al.,<br><br>Respondents. | Case No. 5:25-cv-03143-JFW-KES<br><br>FINAL REPORT AND<br>RECOMMENDATION OF U.S.<br>MAGISTRATE JUDGE |

This Final Report and Recommendation ("R&R") is submitted to the Honorable John F. Walter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.    INTRODUCTION

Michael Zimran ("Zimran") filed this habeas action under 28 U.S.C. § 2241 in November 2025.  Zimran was ordered removed from the United States to Pakistan in 2007 and was released on an order of supervision ("OSUP").  In June 2025, his OSUP was revoked, and he was re-detained by U.S. Immigration and

1

Customs Enforcement ("ICE"). He has been in ICE custody ever since.

As explained in more detail below, this R&R recommends granting his Petition in part and denying it in part. The Petition should be granted as to Ground Two because Respondents failed to give Zimran meaningful notice and opportunity to object to the revocation of his OSUP, which violated 8 C.F.R. §§ 241.4, 241.13 and due process. The Petition should also be granted as to Ground One because Respondents have failed to show changed circumstances demonstrating a significant likelihood that Zimran will be removed to Pakistan in the reasonably foreseeable future, which makes his detention illegal under 8 C.F.R. § 241.13(i)(2). Grounds Three and Four should be denied without prejudice as unripe, because Zimran has not come forward with evidence that Respondents currently intend to remove him to a third country, particularly in light of their request for travel documents from the Pakistani government.

This Final R&R is issued to address the declaration filed by Zimran after the initial R&R was issued (Dkt. 24) and the objections Respondents filed to the initial R&R (Dkt. 25). The undersigned notes that none of the declarations attached to these filings are new evidence. An additional copy of Zimran's declaration was filed to address the Court's concern that the prior declaration was not signed by Zimran personally (but rather by his counsel), and Respondents' objections appear to have re-attached previously submitted declarations from Officers Chavez and Preciado merely for convenience. These filings do not change the undersigned's recommendation, as explained further below.

## II.    PROCEDURAL HISTORY

On November 21, 2025, Zimran filed a petition for writ of habeas corpus under § 2241 ("Petition" at Dkt. 1) and a motion for preliminary injunction and restraining order (Dkt. 3). The Petition raises four claims: (1) Zimran is being detained indefinitely and his removal is not reasonably foreseeable; (2) Respondents improperly revoked his OSUP without giving him adequate notice

2

and an opportunity to be heard; (3) his removal to a third country would violate due process because he has not been given sufficient notice and opportunity to object; and (4) removal to a third country where he might face imprisonment would violate the constitutional prohibition on punitive removal practices.

The Court granted his requests to proceed in forma pauperis (Dkt. 15) and appoint the Federal Public Defender as his counsel (Dkt. 8).

After receiving briefing from the parties, the Court denied the request for preliminary injunctive relief on December 8, 2025.  (Dkt. 17.)[1]  The Court found that Zimran had "not met his burden to establish that he [was] likely to succeed on the merits" because he "relie[d] solely on argument and factual allegations that lack[ed] evidentiary support," including declarations from Zimran's attorneys, who did "not have any personal knowledge of the facts," and unauthenticated exhibits. (Id. at 5.)  The Court found that Respondents' evidence—including "documentary evidence demonstrating that the Pakistani Consulate issued travel documents for [Zimran] as recently as September 23, 2024"—supported Respondents' contention that he was "likely to be removed in the reasonably foreseeable future, and that [his] release was revoked following the proper procedures."  (Id. at 6.)  However, the Court noted that "Respondents' evidence may be contradicted in a later stage of this litigation…."  (Id.)

On December 11, 2025, the Magistrate Judge set a briefing schedule for the underlying Petition.  (Dkt. 18.)  Respondents filed an answer (Dkt. 19), which attaches the same declarations from two Department of Homeland Security

---

[1] Under General Order 05-07, this case is referred to the undersigned Magistrate Judge to consider preliminary matters and prepare a report and recommendation regarding the disposition of the case.  (Dkt. 3.)  However, applications or motions seeking injunctive relief may not be referred to a magistrate judge.  See 28 U.S.C. § 636(b)(1)(A); General Order 05-07, https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO-05-07.pdf.

("DHS") Deportation Officers, Enrique Chavez (Dkt. 19-1) and Jorge Preciado (Dkt. 19-2), that Respondents relied on in opposing the preliminary injunction motion.  (See Dkt. 10-1 (Chavez declaration filed on Nov. 26, 2025 with Respondents' opposition); Dkt. 16-1 (Preciado declaration filed on Dec. 5, 2025 with Respondents' sur-reply).)  Petitioner filed a reply (Dkt. 20), which attaches new declarations from Zimran (Dkt. 20-1) and one of his attorneys, Estalyn Marquis (Dkt. 20-2).  Petitioner's reply argues that a hearing is necessary to resolve disputed facts (Dkt. 20 at 10) and that he should be released on bail pending resolution of the Petition (id. at 13).

## III.   EVIDENCE IN THE RECORD

### A.   Entry into the U.S. and Removal Order (1999-2007).

Zimran entered the United States when he was a minor.  (Chavez Decl. ¶ 6 / Dkt. 9-1 at 1 (stating Petitioner entered the United States on B-2 visitor visa in 1999); Zimran Decl. ¶ 3 / Dkt. 20-1 at 2 ("I have been in the United States since I was a child.").)  He is "Christian (Presbyterian denomination) and also [has] heritage as a Messianic Jew."  (Zimran Decl. ¶ 3 / Dkt. 20-1 at 2.)

According to Respondents, in 2005 he was convicted of robbery, possession of a weapon for a dangerous purpose, and conspiracy to commit theft in Quebec, Canada.  (Chavez Decl. ¶ 7 / Dkt. 9-1 at 1.)  Apparently due to these convictions, he was ordered removed from the United States to Pakistan.  The removal order became final on March 5, 2007, when the Board of Immigration Appeals ("BIA") dismissed his appeal.  (Chavez Decl. ¶¶ 9-10 / Dkt. 16-1 at 1; Zimran Decl. ¶ 6 / Dkt. 20-1 at 2.)

### B.   Zimran's Release on OSUP and DHS's Attempts to Obtain Travel Documents from Pakistan (2008-2020).

In 2008, Zimran was released from ICE custody on an OSUP pending his removal.  (Chavez Decl. ¶ 11 / Dkt. 19-1 at 1-2; Zimran Decl. ¶ 7 / Dkt. 20-1 at 2.)  Between 2008 and 2020, Zimran "regularly checked in as required with [ICE]

without any issues." (Zimran Decl. ¶ 7 / Dkt. 20-1 at 2.)

DHS attempted to obtain travel documents for him from Pakistan. In February 2007, the Consulate General of Pakistan sent Zimran a letter stating:

> We have received a request for the issuance of a Travel Document for [Zimran]. This is to inform you that we have referred his case to the concerned authorities in Pakistan for verification of his national status and the reply is still awaited from them. Therefore in the absence of any documentary evidence of Pakistani Citizenship, [t]he Consulate is not in a position to issue a travel document to [Zimran].

(Pet. Ex. A / Dkt. 1-1 at 3; Zimran Decl. ¶ 8 / Dkt. 20-1 at 2-3 (authenticating the letter).) In March 2009, the consulate sent a similar letter stating it had "requested for verification of documents of [Zimran] from concerned quarters to which we have not received any response so far." (Pet. Ex. A / Dkt. 1-1 at 2; Zimran Decl. ¶ 8 / Dkt. 20-1 at 2-3.)

## C. Zimran's Detention by ICE in New York (2021-2022).

On January 26, 2022, Zimran filed a habeas petition in the Southern District of New York alleging that he had been re-detained by ICE in March 2021 and should be released because his removal to Pakistan was not reasonably foreseeable. Zimran v. DuBois, No. 1:22-cv-00669-CM-SN (S.D.N.Y.), Dkt. 1.[2] In April 2022, the parties stipulated to voluntarily dismiss the petition because ICE had released him from custody "conditionally … while it awaits receipt of travel documents for his removal…." (Zimran Decl. Ex. B / Dkt. 20-1 at 11.) Petitioner was in ICE detention "for over a year in New York" before the government agreed to release him. (Zimran Decl. ¶ 9 / Dkt. 20-1 at 3.)

---

[2] The Court takes judicial notice of the records from the U.S. District Court for the Southern District of New York. See generally Fed. R. Evid. 201.

**D.      Zimran's Relocation to Denver, Colorado (2022-2023).**

After Zimran's release in 2022, he was initially placed on the "Intensive Supervisory Appearance Program" or "ISAP," which required him to regularly check in with ICE and wear a GPS monitoring device. (Zimran Decl. ¶ 10 / Dkt. 20-1 at 3.)

He "could not afford to procure housing" because he had been unable to work while in ICE custody; he "initially stayed with a friend in New York for a short period and later moved to Denver, Colorado in May 2022 in search of employment and affordable housing." (Zimran Decl. ¶ 11 / Dkt. 20-1 at 3.) From May 2022 to September 2023, he lived in a homeless shelter in Denver while he looked for employment and then, after he secured employment, lived in various motels. (Zimran Decl. ¶ 12 / Dkt. 20-1 at 3.)

On September 11, 2023, he was "given a new and more lenient" OSUP that did not require him to wear a GPS monitoring device but did require him to regularly check in at ICE's Denver Field Office. (Zimran Decl. ¶¶ 13-14 / Dkt. 20-1 at 4.) He was given this OSUP by an ICE officer in Denver, and he attaches a copy of it to his declaration. (Zimran Decl. Ex. C / Dkt. 20-1 at 14-18.) Page two of the OSUP contains a section called "Personal Report Record." (Zimran Decl. Ex. C / Dkt. 20-1 at 15.) Zimran states, "I was instructed by ICE to bring this Record with me every time I checked in with any ICE office location in the United States. Whenever I checked in with ICE, an ICE officer would log the date of the check-in, write in the officer's name, write in when I would next have to check in with ICE, and then hand the Record back to me." (Zimran Decl. ¶ 14(a) / Dkt. 20-1 at 4.) This record indicates that Zimran checked in with ICE on September 11, 2023, January 17, 2024, September 11, 2024, and March 12, 2025. (Zimran Decl. Ex. C / Dkt. 20-1 at 15.)

The only OSUP mentioned in Respondents' declarations is the one from 2008. (Chavez Decl. ¶ 11 / Dkt. 19-1 at 1-2.) Officer Chavez and Preciado's

declarations do not attach copy of that OSUP.  However, their Answer does not dispute the authenticity of the 2023 OSUP, which was filed in support of Zimran's preliminary injunction request.  (See Dkt. 12-2 at 2.)

E.    **Alleged Issuance of Travel Documents from Pakistan and Absconding by Zimran (2024).**

According to Respondents, on September 23, 2024, the Consulate General of Pakistan issued travel documents for Zimran that would have allowed him to enter the country by air on October 23, 2024.  (Preciado Decl. Ex. A / Dkt. 19-2 at 5.)

According to Officer Chavez, "[A] Form G-56 (Official Request for Appearance) was sent to Zimrani [sic] to report for removal."  (Chavez Decl. ¶ 12 / Dkt. 19-1 at 2.)  Officer Chavez's declaration does not attach a copy of this Form G-56.  Officer Preciado's declaration also does not attach the Form G-56.  It attaches "Zimran's Form I-213 that notes on page 2 that 'a G-56 was sent to [Zimran] to report for removal but he absconded.'"  (Preciado Decl. ¶ 11 / Dkt. 19-2 at 2.)  This Form I-213 was not completed by Officer Preciado, but rather by Officer Michael Workman.  (Preciado Decl. Ex. B / Dkt. 19-2 at 13-15.)  It appears to have been completed about six months later, on June 2, 2025, the date Zimran was taken into custody.  (Id.)

According to Officer Preciado, "On or about October 18, 2024--after Zimran failed to report timely for removal on October 15, 2024--DHS declared Zimran an absconder and instructed an arrest upon encounter because the issued [travel document] was set to expire on December 19, 2024."  (Preciado Decl. ¶ 12 / Dkt. 19-2 at 2.)

Zimran disputes that DHS ever obtained travel documents from Pakistan.  (Reply at 5.)  He declares that ICE never told him about the travel documents by phone or by mail during this period, although they had his contact information (which he lists in the declaration).  (Zimran Decl. ¶ 14(b) / Dkt. 20-1 at 4.)  Per the "Personal Report Log" attached to Zimran's 2023 OSUP, Zimran checked in at

ICE's Denver Field Office on September 11, 2024 and was told to check in again on March 12, 2025; he appeared on both dates.  (Zimran Decl. Ex. C / Dkt. 20-1 at 15.)  Zimran declares he "was never told" at the March 12, 2025 check-in "that the Government had procured travel documents for [him] nor was [he] detained." (Zimran Decl. ¶ 14(c) / Dkt. 20-1 at 5.)  At the March check-in, he requested permission to move to another state; he "was told by ICE officers that [he] could move anywhere [he] wanted, but that [he] would need to check in with the local ICE field office when [he] did so."  (Id.)

Respondents dispute that Zimran checked in with ICE on March 2025. Officer Preciado declares that "DHS has no record of any encounter with Zimran" between December 20, 2024 and June 1, 2025.  (Preciado Decl. ¶ 14 / Dkt. 19-2 at 2.)

### F.    Zimran's Relocation to Portland and Re-Detention (2025).

In late May 2025, Zimran moved to Portland, Oregon in search of new employment.  (Zimran Decl.  14(d) / Dkt. 20-1 at 5.)  Although he was not scheduled for another check-in until September 2025, he reported to ICE's field office in Portland to notify them of the move "on June 2, within 72 hours of [his] arrival."  (Zimran Decl. ¶ 14(d) / Dkt. 20-1 at 5.)  At that check-in, his OSUP was revoked, and he was detained by ICE.  (Chavez Decl. ¶ 13 / Dkt. 19-1 at 2; Shah Decl. ¶ 3(f) / Dkt. 1 at 17.)[3]

On July 15, 2025, DHS mailed a travel document request packet to the Consulate General of Pakistan.  (Chavez Decl. ¶ 17 / Dkt. 19-1 at 3.)  As of November 26, 2025, DHS is attempting to remove Zimran to Pakistan and is not seeking to remove him to a third country.  (Chavez Decl. ¶ 21 / Dkt. 19-1 at 3.)

---

[3] More facts about the procedures used to revoke his OSUP at the June 2, 2025 check-in are discussed below.

## IV.    DISCUSSION

### A.    The Court Should Consider Zimran's Declaration and the Attached Exhibits, Which Are Now Properly Authenticated.

As noted above in the Procedural History section, on December 8, 2025, the Court denied Zimran's request for a preliminary injunction and temporary restraining order in part because the "only evidentiary support offered" by Zimran was declarations from his attorneys, who did "not have any personal knowledge of the facts…." (Dkt. 17 at 5.)

The initial R&R recommended considering the new declaration from Zimran attached to his Reply, even though it was signed by Zimran's counsel rather than Zimran himself, because counsel declared that she had read it to him verbatim over the phone and that he had authorized her to sign it on his behalf. (Dkt. 21 at 8-10.)[4] After the initial R&R was issued, Zimran's counsel filed a copy of the declaration that is personally signed by Zimran, which counsel received in the mail shortly after the initial R&R was issued. (Dkt. 24.) Accordingly, the Court should consider the statements made in Zimran's declaration. As discussed further below, Zimran's declaration contains new evidence not previously considered by the Court, which (a) tends to show that Zimran checked in with ICE during the time period that Respondents contend he absconded, (b) describes the circumstances of Zimran's detention and OSUP revocation on June 2, 2025, and (c) relates information Zimran obtained from the Pakistani Consulate about the status of Respondents' request for travel documents.

---

[4] The initial R&R noted that Courts in this district have approved similar procedures where the petitioner is in custody, as long as counsel files a copy of the signed declaration in the record upon receipt or as soon as practicable. See, e.g., Ton v. Noem, No. 25-cv-3348-DMG-DSR (C.D. Cal. Dec. 22, 2025), Dkt. 12 at 2 n.2; Luu v. Bowen, No. 25-cv-03145-MEMF-SP, 2025 WL 3552298, at *4, 2025 U.S. Dist. LEXIS 257061, at *11 (C.D. Cal. Dec. 11, 2025).

**B.**      **Respondents Failed to Give Zimran Meaningful Notice and an Opportunity to Respond to the Reasons Why They Were Revoking His OSUP.**

Zimran argues Respondents "violated both due process and INA regulations by reimprisoning Zimran without notice and an opportunity to be heard" (Pet. at 8), because the process consisted of "quickly showing Zimran several pages of documents without providing him copies or an opportunity to respond and then threatening him into signing these documents…." (Dkt. 12 at 25 (reply in support of preliminary injunction motion)).  Respondents argue that he was properly served with a notice of revocation and given an informal interview at the time of his arrest on June 2, 2025.  (Answer at 11-14.)

**1.      Legal Standard.**

a.      Regulations.

"Once ICE releases a noncitizen on an OSUP, 'ICE's ability to re-detain that noncitizen is constrained by its own regulations.'"  Manivong v. Bondi, No. 25-cv-6747-JFW-KES, 2025 WL 3211455, at *5, 2025 U.S. Dist. LEXIS 171812, at *13 (C.D. Cal. Sept. 3, 2025) (quoting Roble v. Bondi, No. 25-cv-3196, 2025 WL 2443453, at *3, 2025 U.S. Dist. LEXIS 164108, at *6 (D. Minn. Aug. 25, 2025)).  Under 8 C.F.R. § 241.4, an OSUP may be revoked if a noncitizen violates the conditions of their release, or if specific ICE officials find that (1) "the purposes of release have been served," (2) "it is appropriate to enforce a removal order or to commence removal proceedings against" the noncitizen, or (3) the "conduct" of the noncitizen, "or any other circumstance, indicates that release would no longer be appropriate."  8 C.F.R. § 241.4(*l*)(1)-(2).

However, a separate regulation, 8 C.F.R. § 241.13, was promulgated in 2001 in response to Zadvydas v. Davis, 533 U.S. 678 (2001).  It applies where the noncitizen "has provided good reason to believe there is no significant likelihood of removal … in the reasonably foreseeable future."  8 C.F.R. § 241.13(a); see

generally Hoang v. Santa Cruz, No. 25-cv-2766-JGB-JC, 2025 WL 3141857, at *3, 2025 U.S. Dist. LEXIS 212737, at *9 (C.D. Cal. Oct. 28, 2025) ("Following the Supreme Court's decision in Zadvydas v. Davis, ICE issued 8 C.F.R. § 241.13 to govern custody determinations for noncitizens subject to a final order of removal whose removal period has expired and where there is not a significant likelihood of removal.").  If there is a determination under § 241.13 that there is no such significant likelihood, § 241.13(b)(1) allows for the release of the noncitizen under an OSUP if they are not a danger to the public or a risk of flight.

"[I]f a noncitizen is subject to 8 C.F.R. § 241.13, ICE may only detain them under more limited circumstances than 8 C.F.R. § 241.4(*l*) and must similarly provide them an informal interview." Hoang, 2025 WL 3141857, at *3, 2025 U.S. Dist. LEXIS 212737, at *9.  Section 241.13(i) allows DHS to revoke a noncitizen's OSUP and re-detain them if they violate any of the conditions of release, 8 C.F.R. § 241.13(i)(1), or "if, on account of changed circumstances, [DHS] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future," 8 C.F.R. § 241.13(i)(2).

Regardless of the reason for the revocation,[5] both §§ 241.4 and 241.13 require that the noncitizen be (a) "notified of the reasons for revocation of his or her release," and (b) given "an initial informal interview promptly after his or her

_____

[5] In this case, Respondents appear to concede that Zimran was entitled to these procedural protections.  (See Answer at 12 ("The foregoing process is more than sufficient under the relevant regulations and the U.S. Constitution—and no more process is due to him.  See, e.g., 8 C.F.R § 241.4(l); id. § 241.13(i)(3).").)  Regardless, the Court agrees with the cases holding that these procedural protections apply regardless of the reason for the OSUP revocation.  See Ceesay v. Kurzdorfer, 781 F. Supp. 3d 137, 163-64 (W.D.N.Y. 2025) (rejecting the government's argument that "an informal interview is required only if supervision is revoked based on a violation of a condition of release"); Hassanzadeh v. Warden, No. 25-cv-2113-DMG-MAA, 2025 WL 3306272, at *4, 2025 U.S. Dist. LEXIS 234890, at *10-12 (C.D. Cal. Nov. 25, 2025) (same).

11

return to Service custody to afford the alien an opportunity to respond to the reasons for revocation *stated in the notification*."  8 C.F.R. §§ 241.4(*l*)(1), 241.13(i)(3) (emphasis added).  Thus, "ICE's regulations require that when an alien is notified of a revocation of release, the 'reasons' for that revocation must be stated in the notification."  Nouri v. Herrera, No. 25-cv-1905-JFW-DTB, 2025 U.S. Dist. LEXIS 171809, at *13 (C.D. Cal. Sep. 3, 2025).

b.  Due Process.

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law.  U.S. Const. amend. V.  Due process rights extend to noncitizens present in the United States, including those subject to final removal orders.  Zadvydas, 533 U.S. at 693-94.  The fundamental requirements of due process are that a person be afforded notice and opportunity to be heard "at a meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

DHS's failure to follow regulations providing a noncitizen with notice and an opportunity to be heard may constitute a due process violation.  See Diaz v. Wofford, No. 25-cv-01079, 2025 WL 2581575, at *7, 2025 U.S. Dist. LEXIS 173666, at *18-19 (E.D. Cal. Sept. 5, 2025) ("DHS's failure to follow its own procedural regulations may constitute a due process violation."); McSweeney v. Warden of Otay Mesa Det. Facility, No. 25-cv-02488, 2025 WL 2998376, at *7, 2025 U.S. Dist. LEXIS 210271, at *19-20 (S.D. Cal. Oct. 24, 2025) ("Both § 241.4 and § 241.13 were intended 'to provide due process protections to [noncitizens] following the removal period as they are considered for continued detention, release, and then possible revocation of release.' … ICE deprived Petitioner of these due process protections when it failed to provide him with sufficient notice or a prompt interview to respond to the reasons for revocation of his release.").

2.  **Evidence Submitted by the Parties.**

Zimran argues that DHS violated due process and its own regulations when

12

his OSUP was revoked.  (Pet. at 8-10.)  Respondents respond that Zimran "was *immediately* issued a Notice of Revocation upon his detention" and "*immediately* provided an informal interview" when he was detained on June 2, 2025.  (Answer at 11.)

A "Notice of Revocation of Release" was served on Zimran when he was detained on June 2, 2025.  (Chavez Decl. ¶ 15 / Dkt. 19-1 at 2.)  Zimran Decl. ¶ 15(a) / Dkt. 20-1 at 6 ("As I was being arrested, I was shown several pages of documents, including a written notice that I was being re-detained.").)  The notice stated:

> This letter is to inform you that your order of supervision has been revoked and you will be detained in the custody of U.S. Immigration and Customs Enforcement (ICE) at this time.  This decision has been made based on a review of your official alien file and a determination that there are changed circumstances in your case.
>
> ICE has determined that you can be expeditiously removed from the United States pursuant to the outstanding order of removal against you.  On March 5, 2007, you were ordered removed to Pakistan by an authorized U.S. DHS/DOJ official and you are subject to an administratively final order of removal.  Your case is under current review by Pakistan for the issuance of a travel document.
>
> Based on the above, and pursuant to 8 C.F.R. § 241.4 / 8 C.F.R. § 241.13, you are to remain in ICE custody at this time.  You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation.  You may submit any evidence or information you wish to be reviewed in support of your release.  If you are not released after the informal interview you will receive notification of a new review,

which will occur within approximately three months of the date of this notice.

(Chavez Decl. Ex. A / Dkt. 19-1 at 6.)  The notice attaches an "Order of Supervision Revocation Assessment," which lists Zimran's "Supervision Compliance History," "Criminal History since OSUP release," and "Travel Document Status," as well as identifying information for Zimran, such as his A number and birth date.  (Id. at 7.)

Respondents also submit a form entitled "Alien Informal Interview Upon Revocation of Order of Supervision Under 8 C.F.R. § 241.4(*l*); 8 C.F.R. § 241.13(i)."  (Chavez Decl. Ex. B / Dkt. 19-1 at 9.)  The form states that Deportation Officer Michael Workman conducted an informal interview with Zimran on June 2, 2025 "in order to afford the alien an opportunity to respond to the reasons for revocation of his or her order or supervision stated in the notification letter."  (Id.)  The form states that Zimran did not provide a written statement and "requested a copy to complete at a later date due to not knowing what to write at this moment."  (Id.)  The form attaches a proof of service signed by Zimran and a different officer named Dietz.  (Id. at 10.)

Zimran's declaration states, "As [he] was being arrested, the arresting ICE officer orally remarked that there had been a change in circumstances justifying [his] re-detention: namely, ICE had obtained travel documents for [him] and had been unable to contact [him] about the travel documents in December 2024."  (Zimran Decl. ¶ 15 / Dkt. 20-1 at 6.)  He "was shown several pages of documents, including a written notice that [he] was being re-detained.  ICE officers instructed [him] to quickly sign some of these pages, threatening ICE would press charges against [him] if [he] did not.  [He] complied."  (Id., ¶ 15(a).)  He "requested a copy of the written notice [he] was shown, but was never provided with it or any other

14

papers connected to the revocation" of the OSUP.  (Id., ¶ 15(b).)[6]

### 3. Analysis.

The record does not demonstrate that Zimran had meaningful notice of the reasons why his OSUP was revoked or opportunity to challenge that revocation at the informal interview conducted on June 2, 2025.

Respondents' Answer gives multiple possible reasons for the revocation, including Zimran's "failure to comply with the terms of his OSUP release … by engaging in criminal activities" and "absconding on or about October 15, 2024 after his travel document (TD) for removal to Pakistan issued and remaining in that status until the TD had expired." (Answer at 11.)  The latter is consistent with what the arresting officer orally told Zimran at the informal interview.  (Zimran Decl. ¶ 15 / Dkt. 20-1 at 6.)  Either of these reasons might be consistent with a revocation based on violation of the conditions of his OSUP under 8 C.F.R. § 241.4 or § 241.13(i)(1).  However, the written notice of revocation refers only to Zimran's alleged imminent removal to Pakistan.  (Chavez Decl. Ex. A / Dkt. 19-1 at 6.)  This is consistent with a revocation under 8 C.F.R. § 241.13(i)(2) based on "changed circumstances" indicating "a significant likelihood that the alien may be removed in the reasonably foreseeable future."

Because the regulations require a noncitizen to be given written notice of the reasons their OSUP is being revoked, Respondents cannot rely on new, ad hoc reasons for removal that are not stated in the notice served on Zimran.  See 8 C.F.R. §§ 241.4(*l*)(1), 241.13(i)(3) (stating the noncitizen is entitled to an informal

---

[6] Respondents do not contest Zimran's description of his arrest.  Zimran made the same allegations in his briefing supporting his motion for preliminary injunction.  (See Dkt. 12 at 37-38.)  Respondents' subsequent Answer did not include any new evidence or argument about these allegations.  There is no indication that either Officer Chavez or Officer Preciado were present at the time of Zimran's arrest.

interview "to respond to the reasons for revocation *stated in the notification*") (emphasis added); Nouri, 2025 U.S. Dist. LEXIS 171809, at *13 ("ICE's regulations require that when an alien is notified of a revocation of release, the 'reasons' for that revocation must be stated in the notification.").[7]

The reasons stated in the notice were that, due to "changed circumstances," Zimran could now "be expeditiously removed from the United States." (Chavez Decl. Ex. A / Dkt. 19-1 at 6.) The only purportedly changed circumstances identified in the notice were that Zimran had been ordered removed to Pakistan in 2007 and that his "case is under current review by Pakistan for the issuance of a travel document."[8] (Id.) The notice did *not* state that DHS had obtained travel

[7] Even if the Court could consider a reason not listed in the notice of revocation, Respondents have not demonstrated that Zimran violated the terms of the OSUP. First, they have not provided a copy of any OSUP stating the conditions to which Zimran was subject. Officer Chavez's declares that Zimran was subject to an OSUP issued in 2008, but he does not provide a copy of it. (Chavez Decl. ¶ 11 / Dkt. 19-1 at 1-2.) Zimran declares that he was issued a new OSUP in 2023, and he does attach a copy. (Zimran Decl. ¶ 13, Ex. C / Dkt. 20-1 at 4, 14.) Second, the information in DHS paperwork about the convictions is sparse and somewhat contradictory. (See Chavez Decl. Ex. A / Dkt. 19-1 at 7 (under "Criminal History since OSUP release (pending conv(s), parole violation, etc…)" listing, "Trespassing 7/27/24; DUI 11/04/2020; Aggravated DUI 11/04/2020; DUI 12/05/2020"); Preciado Decl. Ex. B / Dkt. 19-2 at 14 ("On 12/09/2020, the subject was arrested for the crime of 'Possession Forged (identify in comments)' which is still pending. On 12/05/2020, the subject was arrested for the crime of 'Driving Under Influence Liquor' which resulted in a conviction on 05/03/2021. The subject was sentenced to N/A. [sic] … Record checks through National Crime Information System (NCIC) revealed no prior arrest or convictions.").) Neither Officer Chavez nor Officer Preciado appear to have reviewed the underlying criminal documents or otherwise have any personal knowledge of the convictions. Third, as noted above, Zimran disputes that he absconded in 2024 and has provided at least some evidence that he did not. It is undisputed that he voluntarily checked in with ICE in Portland on June 2, 2025, the date he was arrested.

[8] This appears to be untrue. The previous travel documents from Pakistan had expired in December 2024, and Respondents did not apply for new documents until July 15, 2025, more than a month after this notice was issued. (See Chavez

16

documents to Pakistan in 2024.  This is the key fact that might demonstrate changed circumstances.  Zimran's removal order was nearly twenty years old and, as far as Zimran knew at the time of his arrest, Pakistan had been reviewing DHS's request for travel documents since that date.  (See Pet. Ex. A / Dkt. 1-1 at 2-3 (letters from the Pakistani Consulate in 2007 and 2009 about the status of DHS's request).)  Cf. Esmail v. Noem, No. 25-cv-08325-WLH-RAO, 2025 WL 3030590, at *5, 2025 U.S. Dist. LEXIS 215023, at *8 (C.D. Cal. Sept. 12, 2025) ("The Notice contains no factual allegations that led to the custody redetermination. … As the Notice does not 'identify any specific changed circumstances[,]' it is insufficient to put Petitioner on notice as to what led to the revocation of his OSUP.") (citation omitted).

The arresting officer's oral statements and the background information listed in the attached assessment were not enough to give Zimran sufficient notice to meaningfully contest DHS's determination of changed circumstances at the interview, particularly given the hurried and informal nature of that interview (as described in Zimran's uncontested declaration), the fact that the officers did not allow Zimran to keep a copy of the written notice, and the regulations' requirement that the reasons for revocation be stated in the notice itself.  Cf. McSweeney v. Warden of Otay Mesa Det. Facility, No. 25-cv-02488, 2025 WL 2998376, at *6 (S.D. Cal. Oct. 24, 2025) ("Between the order of removal, the notice of revocation of release, and the conversation reflected on the Form I-213, Petitioner was told that he may be removed to at least three different countries.  ICE's conclusory and unclear explanation for revoking Petitioner's release 'did not offer him adequate notice of the basis for the revocation decision such that he could meaningfully respond at the post-detention informal interview.'") (quoting Diaz v. Wofford, No. 25-cv-01079, 2025 WL 2581575, at *8 (E.D. Cal. Sept. 5, 2025)).

---

Decl. ¶ 17 / Dkt. 19-1 at 3; Preciado Decl. ¶ 13 / Dkt. 19-2 at 2.)

17

Accordingly, Zimran is entitled to relief on this claim. Respondents should be ordered to immediately release him from custody pursuant to the conditions of his preexisting 2023 OSUP and be enjoined and restrained from re-detaining him unless and until they follow the procedures set forth in 8 C.F.R. §§ 241.4(*l*) and 241.13(i). See Zadori v. Noem, No. 25-cv-02832-MRA-DFM, 2025 WL 3724456, at *4, 2025 U.S. Dist. LEXIS 267221, at *13 (C.D. Cal. Nov. 19, 2025) (collecting cases holding that "when ICE fails to follow its own regulations in revoking release, the detention is unlawful, and the petitioner's release must be ordered"); Phan v. Noem, No. 25-cv-02422-RBM-MSB, 2025 WL 2898977, at *5, 2025 U.S. Dist. LEXIS 201411, at *13 (S.D. Cal. Oct. 10, 2025) ("The Court's research indicates that every district court, except one, to consider the issue has 'determined that where ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered.'") (footnote omitted); Esmail, 2025 WL 3030590, at *6, 2025 U.S. Dist. LEXIS 215023, at *17 (rejecting respondents' argument that the proper remedy for failing to follow the OSUP revocation procedures was to provide the petitioner with a proper interview, reasoning, "The fact that he was not given an interview renders his detention unlawful in the first place, necessitating his release.").

### 4. Respondents' Objections to the Initial R&R.

#### a. Warrant of Removal/Deportation.

Respondents appear to object that any vagueness in the Notice of Revocation was cured because Zimran was also served with a Warrant of Removal/Deportation (Form I-205), which "notifi[ed] him that DHS intends to execute his final removal order and process him for removal to Pakistan." (Dkt. 25 at 16; Chavez Decl. ¶ 14 / Dkt. 19- 1 at 2.) Even if this was sufficient to comply with the applicable regulations—which, as discussed above, appear to require that the reasons for revocation be stated in the notice itself—Respondents have never produced a copy of this warrant. Although Officer Chavez declares that the warrant was served, he

18

was not the one who served it, as no one contends that he was present when Zimran was detained on June 2, 2025. His declaration is based only on his "personal and professional knowledge, consultation with other ICE personnel, and review of official documents and records maintained by the agency and Department and other relevant sources obtained during the regular course of business." (Chavez Decl. ¶ 2 / Dkt. 19-1 at 1.) If his assertion that the warrant was served on Zimran is based on review of some paperwork, it is unclear why Respondents have not produced that underlying paperwork.

Regardless, if all the warrant stated was that DHS was attempting to remove Zimran to Pakistan, this would not have given Zimran sufficient notice of what "changed circumstances" had created "a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i). DHS had been attempting to remove Zimran to Pakistan since he was ordered removed in 2007. Again, the key facts Respondents are now relying on to demonstrate changed circumstances are that (a) Pakistan issued travel documents for Zimran in September 2024, and (b) Zimran allegedly absconded until those travel documents expired. These facts were not stated anywhere in the notice of revocation or any other document served on Zimran. As discussed throughout this R&R, Zimran has at least some evidence that he did not abscond, and he was never given an opportunity to present that evidence before he was detained (a detention that, as of the issuance of this Final R&R, has lasted more than seven months).

      b.  Broad Authority to Revoke Supervised Release.

Next, Respondents object that "the government has very broad authority to revoke supervised release that it has granted," citing catchall language from 8 C.F.R. § 241.4(*l*) stating that release can be revoked in "any other circumstance." (Dkt. 25 at 17.) As discussed above, however, "[I]f a noncitizen is subject to 8 C.F.R. § 241.13, ICE may only detain them under *more limited circumstances* than 8 C.F.R. § 241.4(*l*) and must similarly provide them an informal interview."

19

Hoang, 2025 WL 3141857, at *3, 2025 U.S. Dist. LEXIS 212737, at *9 (emphasis added).

c.    Whether ICE Regulations Establish Substantive Rights.

Respondents cite Judge Birotte's order denying a TRO application in Sanchez v. Bondi, No. 25-cv-02530-AB-DTB, 2025 WL 3190816, 2025 U.S. Dist. LEXIS 196639 (C.D. Cal. Oct. 3, 2025), for the proposition that 8 C.F.R. §§ 241.13 and 214.4 do not create substantive rights.  (Dkt. 25 at 18.)  However, with the benefit of more complete briefing in connection with Sanchez's subsequent request for a preliminary injunction, Judge Birotte reversed himself, reasoning:

> Petitioner has substantially supplemented his prior TRO arguments providing new authority and emphasizing regulatory requirements that were not previously cited. … In particular, Petitioner relies on several district court decisions recognizing that ICE's regulatory obligations under 8 C.F.R. § 241.13(i) are enforceable and binding.  See, e.g., Jane Doe 1 v. Nielsen, 357 F. Supp. 3d 972, 1000 (N.D. Cal. 2018); Delkash v. Noem, 2025 WL 2683988 (C.D. Cal. Aug. 28, 2025); Esmail v. Noem, 2025 WL 3030589 (C.D. Cal. Sept. 26, 2025); Constantinovici v. Bondi, —— F.Supp.3d ——, 2025 WL 2898985 (S.D. Cal. Oct. 10, 2025); Medina v. Noem, 794 F.Supp.3d 365 (D. Md. 2025).
>
> The Court finds Esmail and Delkash particularly persuasive. … Both cases were decided within the last four months out of this district on materially similar facts and concluded that ICE must adhere to the procedural safeguards imposed by the regulations. … Petitioner also emphasizes that regulatory obligations, rather than the Immigration and Nationality Act ("INA") alone, govern the procedures for revocation of supervised release and notice to

20

noncitizens. …

These new arguments were not presented as thoroughly in the TRO Application, and Respondents have not meaningfully addressed them. … Given the supplementation with new authority directly on point, the Court is persuaded that the regulations constitute binding legal requirements for ICE's revocation process. … While the Court previously held that statutory authority under the INA predominated, the Court now finds that ICE's compliance with the regulatory framework is a proper and enforceable basis for review.

Morales Sanchez v. Bondi, No. 25-cv-02530-AB-DTB, 2025 WL 3651899, at *3, 2025 U.S. Dist. LEXIS 262536, at *7-8 (C.D. Cal. Dec. 5, 2025) (granting preliminary injunction and ordering Sanchez's immediate release from custody). Thus, the reasoning of Sanchez actually supports the recommendation made in this R&R.

d.      Whether Release is the Appropriate Remedy.

Respondents object that the initial R&R is "nitpicking that post-revocation procedure was not followed properly here" (Dkt. 25 at 16), and that, even if ICE violated the procedures laid out in the regulations and/or due process, Zimran "fails to show any such violation to warrant his release" (id. at 15).  They suggest that any procedural deficiencies "could be cured by means well short of release" (id. at 19), although they do not suggest any specific means.  They cite several cases finding that petitioners were not entitled to release from custody.  (Dkt. 25 at 18-19); Ahmad v. Whitaker, No. 18-cv-287, 2018 WL 6928540 (W.D. Wash. Dec. 4, 2018), R&R adopted, 2019 WL 95571 (W.D. Wash. Jan. 3, 2019); Doe v. Smith, No. 18-cv-11363, 2018 WL 4696748 (D. Mass. Oct. 1, 2018); Pogosyan v. Bondi, No. 5:25-cv-03121-SRM-AS, Dkt. 13 (C.D. Cal. Dec. 3, 2025).  These cases are distinguishable.

In Pogosyan, the record contained evidence that Pogosyan was served with a

21

written notice of revocation which specifically stated that the revocation was based on criminal convictions that violated the terms of Pogosyan's OSUP; the only defect was the lack of an informal interview. Pogosyan, Dkt. 13 at 11-12 (partially denying and partially granting Pogosyan's application for a TRO).[9] Here, in contrast, the notice served on Zimran did not give him reasonable notice of the changed circumstances, as discussed above.

To the extent Ahmad can be interpreted as holding that 8 C.F.R. § 241.13 does not require that a noncitizen be given notice of the reasons his OSUP is being revoked, see 2018 WL 6928540, at *5 ("The regulations do not require notice, and Mr. Ahmad received none. See generally id. at § 241.13."), the undersigned respectfully disagrees. The regulation provides, "Upon revocation, the alien will be *notified of the reasons* for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation *stated in the notification*." 8 C.F.R. § 241.13(i)(3) (emphasis added). As discussed above, many district courts have found that this requirement is meaningful and enforceable.

Moreover, Ahmad is factually distinguishable because there the court found no "actionable injury" since "ICE had procured a travel document and scheduled Mr. Ahmad's removal." 2018 WL 6928540, at *5. Similarly, in Doe, the court

---

[9] The undersigned also notes that the Pogosyan case remains ongoing. On December 18, 2025, Judge Murillo ordered the respondents to file additional evidence that they had conducted the interview required by her TRO, as they had not submitted a declaration from an officer with personal knowledge. Pogosyan, Dkt. 17. The respondents failed to timely respond. On December 31, 2025, Pogosyan filed a second TRO application seeking release from custody. Id., Dkt. 18. On January 12, 2026, the respondents opposed the second TRO application and submitted additional evidence about the interview. Id., Dkt. 21. That second TRO application remains pending.

22

found that "circumstances have in fact changed, and removal appears imminent," based on ICE's uncontradicted representations that "it received notice from ERO headquarters that the Ugandan government would issue the necessary travel documents to effect Doe's removal *after* she was taken into custody." 2018 WL 4696748, at *8-9. As discussed further below in Section IV.C. of this R&R, Respondents have not made such a showing here. See, e.g., Torres Sotomayor v. Bondi, No. 25-cv-02939-SSC, 2025 WL 3691398, at *6 n.5, 2025 U.S. Dist. LEXIS 263968, at *14 (C.D. Cal. Nov. 14, 2025) (distinguishing Ahmad on this basis and ordering the petitioner's release).

Even if release would not be an appropriate remedy based on this violation alone, it is an appropriate remedy considering that Respondents have not shown that Zimran's removal is significantly likely in the reasonably foreseeable future, as discussed below.

**C.      Respondents Have Not Shown Changed Circumstances Demonstrating a Significant Likelihood That Zimran May Be Removed in the Reasonably Foreseeable Future under 8 C.F.R. § 241.13(i)(2).**

**1.      Legal Standard.**

a.      Zadvydas Standard.

In Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court held that 8 U.S.C. § 1231(a)(6) does not authorize the government to detain an alien awaiting removal "indefinitely" beyond the statutory 90-day removal period. 533 U.S. at 689. The Supreme Court construed the statute to contain an implicit "reasonable time" limitation. Id. at 682. The Court held that "the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." Id. at 682, 689. The Court determined that six months was a presumptively reasonable period of detention. Id. at 701. "After this 6-month period, once the

alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id.  If the government fails to rebut the alien's showing, then the alien is entitled to relief.  See e.g., Chun Yat Ma v. Asher, No. 11-cv-1797, 2012 WL 1432229, 2012 U.S. Dist. LEXIS 58082 (W.D. Wash. Apr. 25, 2012) (granting habeas relief and ordering petitioner released from custody after eleven-month delay in removing petitioner to China).  The Supreme Court noted, "For detention to remain reasonable, as the period or prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." Zadvydas, 533 U.S. at 701.

b.       Regulatory Standard.

Both parties assume that Zadvydas is the governing standard for this claim. (Pet. at 6-8; Answer at 7-12.)  However, "This case is not about ICE's authority to detain in the first place upon an issuance of a final order of removal as in Zadvydas.  This case is about ICE's authority to *re-detain* [the petitioner] after he was issued a final order of removal, detained, and subsequently released on an OSUP.  The DHS regulation, 8 C.F.R. § 241.13(i), applies to non-citizens in [this] situation." Nguyen v. Hyde, 788 F. Supp. 3d 144, 149 (D. Mass. 2025); see also Luu v. Bowen, 2025 WL 3552298, at *6, 2025 U.S. Dist. LEXIS 257061, at *16 (holding that where a petitioner has been re-detained, "Section 241.13 actually codifies how Zadvydas should apply").

Section 241.13(i) does appear to apply here.  Zimran has a final order of removal, the removal period expired, ICE was unable to remove him, and he was released pursuant to an OSUP.   Respondents have not presented any evidence or legal authority suggesting otherwise.  Accordingly, Respondents were required to comply with 8 C.F.R. § 241.13(i) in revoking Zimran's OSUP.

Section 241.13(i) allows DHS to revoke a noncitizen's OSUP and re-detain them if they violate any of the conditions of release, 8 C.F.R. § 241.13(i)(1), or "if,

24

on account of changed circumstances, [DHS] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future," 8 C.F.R. § 241.13(i)(2).  In the present case, as discussed above in Section IV.B of this R&R, the only reason cited in the written notice of revocation served on Zimran was changed circumstances.  To properly revoke an OSUP under those circumstances, the regulation "requir[es] (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future."  Nguyen, 788 F. Supp. 3d at 150 (quoting Kong v. United States, 62 F.4th 608, 619-20 (1st Cir. 2023)).

"[T]he burden-shifting framework from Zadvydas does not apply" where the petitioner has already been "issued a final order of removal, detained, and subsequently released on an" OSUP.  Yan-Ling X. v. Lyons, No. 25-cv-01412-KES-CDB-HC, 2025 WL 3123793, at *3, 2025 U.S. Dist. LEXIS 220277, at *8 (E.D. Cal. Nov. 7, 2025).  Under 8 C.F.R. § 241.13(i)(2), "when ICE revokes release to effectual removal, 'it is [ICE's] burden to show a significant likelihood that the alien may be removed. … [I]mposing the burden of proof on the alien each time he is re-detained would lead to an unjust result and serious due process implications.'"  Yan-Ling X., 2025 WL 3123793, at *4, 2025 U.S. Dist. LEXIS 220277, at *8 (quoting Escalante v. Noem, No. 25-cv-182, 2025 WL 2206113, at *3, 2025 U.S. Dist. LEXIS 148899, at *7 (E.D. Tex. Aug. 2, 2025)); see also Nazarian v. Noem, No. 25-cv-02694-KK-ADS, 2025 WL 3236209, at *5, 2025 U.S. Dist. LEXIS 229051, at *10-11 (C.D. Cal. Nov. 3, 2025) ("Contrary to Respondents' assertions, Petitioner is not challenging his detention during an initial removal period.  See, e.g., Zadvydas, 533 U.S. at 701…. Rather, because Petitioner challenges his re-detention after already being released on an OSUP, 'ICE's own regulations [ ] place the burden on ICE to show changed circumstances that make removal significantly likely in the reasonably foreseeable future.'") (quoting Sun v. Noem, No. 25-cv-2433, 2025 WL 2800037, at *2 (S.D. Cal. Sept. 30, 2025)); El

25

Abed v. Noem, No. 25-cv-02361-FWS-JDE, 2025 WL 3691910, at *4, 2025 U.S. Dist. LEXIS 263943, at *11-12 (C.D. Cal. Oct. 28, 2025) ("Because there appears to be no dispute that Petitioner did not violate the conditions of release, Respondents have the burden to establish changed circumstances that make removal significantly likely in the reasonably foreseeable future and have not done so.").

"The plain language of the regulation … does not allow a court in the first instance to make the required individualized finding.  To the extent ICE claims that it made such a determination, the court should review that claim in light of the regulations instructing ICE on how it should make such a determination."  Nguyen, 788 F. Supp. 3d at 150 (quoting Kong, 62 F.4th at 620); see also Manivong, 2025 WL 3211455, at *5, 2025 U.S. Dist. LEXIS 171812, at *13 (same); Hoac v. Becerra, No. 25-cv-01740, 2025 WL 1993771, at *3, 2025 U.S. Dist. LEXIS 136002, at *6-7 (E.D. Cal. July 16, 2025) (same).  Section 241.13(f) states that DHS should consider the following facts:

> [T]he history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

8 C.F.R. § 241.13(f).

### 2. Evidence Submitted by the Parties.

Officer Preciado declares, "On or about September 20, 2024, the Consulate General of Pakistan notified DHS that Pakistan had issued Zimran's travel documents (TD) and was in the process of transmitting it to DHS.  Attached hereto as Exhibit A is a true and correct copy of the TD, which includes a cover letter,

26

flight itinerary, and a two-page emergency passport." (Preciado Decl. ¶ 6 / Dkt. 19-2 at 1.)

Travel records attached to the declaration indicate that on September 18, 2024, a plane ticket was purchased for Zimran to travel from Denver to Chicago to Abu Dhabi to Islamabad, landing in Islamabad on October 23, 2024. (Preciado Decl. Ex. A / Dkt. 19-2 at 7-9.)  An attached emergency passport is dated September 20, 2024 with an expiration date of December 19, 2024. (Id. at 11.) Also attached is a cover letter from the Pakistani Consulate to DHS dated September 23, 2024 listing Zimran's anticipated travel dates. (Id. at 5.)

Zimran disputes that Respondents successfully obtained travel documents from Pakistan in September 2024, arguing that: (a) "neither of Respondents' declarants can properly authenticate the copy of the travel document submitted" (Reply at 5); (b) Petitioner was not told of the September 2024 travel documents either when he checked in with ICE's Denver Field Office on March 12, 2025, or by mail or phone (Reply at 5; Zimran Decl. ¶ 14(b) / Dkt. 20-1 at 4); and (c) the Pakistani Consulate has not responded to a request from Zimran's counsel about whether Pakistan ever issued travel documents for Zimran (Marquis Decl. ¶ 10, Ex. A / Dkt. 20-2 at 3-6).

Zimran declares he never received notice of these travel documents before his arrest on June 2, 2025. (Zimran Decl. ¶ 14 (b)(ii)-(iii) / Dkt. 20-1 at 4-5.) Neither of Respondents' declarations attaches documents showing that Zimran was sent notice of these travel documents. According to Officer Chavez and Officer Preciado, a Form G-56 (Official Request for Appearance) was sent to Zimran on or about September 27, 2024 with a report date of October 15, 2024. (Chavez Decl. ¶ 12 / Dkt. 19-1 at 2 / Preciado Decl. ¶ 11 / Dkt. 19-2 at 2.)  Yet neither declaration attaches this Form G-56 or any contemporaneous correspondence, like a cover letter.  Officer Preciado's declaration attaches "Zimran's Form I-213 that notes on page 2 that 'a G-56 was sent to [Zimran] to report for removal but he absconded.'"

27

(Preciado Decl. ¶ 11 / Dkt. 19-2 at 2.)  This Form I-213 was not completed by Officer Preciado, but rather by Officer Michael Workman.  (Preciado Decl. Ex. B / Dkt. 19-2 at 13-15.)  Furthermore, it appears to have been completed about six months later, on June 2, 2025, the date Zimran was taken into custody.  (Id.)  No evidence establishes Officer Workman's personal knowledge of if or when a Form G-56 was mailed to Zimran.

Zimran also declares that he has been in phone contact with the Pakistani Consulate in Los Angeles during his detention.  (See Zimran Decl. ¶ 15(g) / Dkt. 20-1 at 7 ("The Adelanto Detention Facility has posted speed-dial numbers to reach different consulates on a wall in the facility.  The posted speed-dial number for the Pakistani Consulate allows for phones at the facility to call the Consulate's Los Angeles office.  I have called the Consulate with this speed-dial number at least twice every week since I was detained.").)  In November,[10] "[t]he Consulate informed [him via telephone that] it had received a Travel Document Request package from the Government, but could not issue [him] any travel documents because it had verified it has no records showing [he is] a Pakistani national."  (Id. ¶ 15(i).)  He "asked the Consulate to send [him] a letter to this effect, but it refused to do so, telling [him] only ICE could ask for such a letter, since they are the requesting authority."  (Id.)  "On December 5, 2025, a representative of the Consulate's Los Angeles office informed [Zimran] that the verification

---

[10] In Zimran's preliminary injunction briefing, Zimran's counsel stated that this call occurred on November 17, 2025.  (Dkt. 1 at 18 (Shah Decl. ¶ 5(u)).)  Officer Preciado's declaration attached to their opposition to that motion and the Answer (dated December 5, 2025) states that "DHS's Detainee Telephone Call Log" shows that Zimran "placed a telephone call" on June 2, 2025, the day he was detained, but that "there is no similar entry for a call (incoming or outcoming [sic]) on or about November 17, 2025."  (Preciado Decl. ¶ 15 / Dkt. 19-2 at 2.)  Zimran's declaration attached to his Reply amends this allegation to state that this call to the consulate occurred "in November."  (Zimran Decl. ¶ 15(i) / Dkt. 20-1 at 8.)

investigation process had been completed and that the consulate cannot verify [his] Pakistani citizenship and that there is no reason for [him] to continue calling." (Id. ¶ 15(g).)

Officer Preciado's declaration, which is dated December 5, 2025, states, "DHS's July 15, 2025 [travel document request] remains pending for active consideration by the Pakistani authorities.  DHS expects that a travel document for Zimran will soon be issued and that it will effectuate his removal to Pakistan in the reasonably foreseeable future."  (Preciado Decl. ¶ 17 / Dkt. 19-2 at 2.)

Zimran declares that on December 17, 2025, he told Officer Preciado about his phone conversations with the Pakistani Consulate.  (Zimran Decl. ¶ 15(j) / Dkt. 20-1 at 8.)  According to Zimran, Officer Preciado responded that "at this point, there is nothing else for [Zimran] to do," "that all [he] can do is wait," and that his "case has been sent to [DHS] Headquarters in Washington, D.C.," which "will decide what happens next."  (Id.)  Officer Preciado said that "DHS Headquarters would make a decision on whether to seek a third country removal or to release" Zimran.  (Id. ¶ 15(k).)

**3.      Analysis.**

a.      Changed Circumstances Based on the 2024 Travel Documents.

Respondents argue that Zimran's removal to Pakistan is reasonably foreseeable because they obtained travel documents from Pakistan in September 2024.  (Answer at 8.)  Zimran challenges the authenticity of the 2024 travel documents and requests an evidentiary hearing to resolve these issues.  (Reply at 5-8.)  The Court does not need to resolve this factual because, even if Respondents' documents are authentic, Respondents have not shown that they complied with § 241.13(i) or that removal to Pakistan is reasonably foreseeable.

When Zimran was detained on June 2, 2025, the prior travel documents had expired on December 19, 2024, nearly six months prior, and DHS did not apply for

29

new ones until July 15, 2025, more than a month *after* Zimran was re-detained. (Chavez Decl. ¶¶ 13, 16 / Dkt. 19-2 at 2.)  There is no evidence in the record about how long it took Respondents to obtain the 2024 travel documents, which DHS had been seeking since Zimran's removal order became final in 2007, and which they had failed to obtain during his previous year-long detention in New York in 2021-2022.  Respondents have not introduced any evidence of a change in U.S. relations with Pakistan or any change in the specifics of Zimran's case.  See generally 8 C.F.R. § 241.13(f) (listing factors DHS should consider in determining whether removal will occur in the reasonably foreseeable future, including inter alia, "the history of the Service's efforts to remove aliens to the country in question"); see Yan-Ling X., 2025 WL 3123793, at *4 , 2025 U.S. Dist. LEXIS 220277, at *10-11 ("Respondents fail to explain why China did not issue a travel document in the past or why China is likely to issue a travel document for petitioner in the reasonably foreseeable future. … Respondents do not explain whether the United States and China have a repatriation agreement in place, do not explain whether removals to China are common, do not identify what considerations the Government of China might take into account when deciding whether to issue a travel document, and do not explain whether the Government of China will look favorably upon petitioner's case.").

As of the date of this R&R, more than five months have passed since DHS requested new travel documents from Pakistan in July 2025.  Respondents have provided no new information about the status of the request since their opposition to the preliminary injunction motion was filed on November 26, 2025.  (Dkt. 10.) In contrast, the evidence submitted by Zimran—information obtained from phone calls to the Pakistani Consulate and a conversation with Officer Preciado in the last few weeks—indicates that Pakistan has neither confirmed his citizenship nor agreed to accept him at the present time.  Compare Manivong, 2025 WL 3211455, at *6, 2025 U.S. Dist. LEXIS 171812, at *15-16 (finding it "very likely that

Petitioner will be removed in the very near future" because DHS had valid, unexpired travel documents and would have removed the petitioner if the court had not temporarily enjoined the respondents from removing him).

The 2024 travel documents alone, which are now expired, are insufficient to meet Respondents' burden of proof. They have not shown that, either at the time of Zimran's June 2025 OSUP revocation or presently, changed circumstances have made it significantly likely that he will be removed to Pakistan in the reasonably foreseeable future.

b.    Zimran's Alleged Failure to Cooperate.

Respondents argue that where a noncitizen "refuses to cooperate in obtaining travel documents for purposes of effectuating their removal," the noncitizen cannot seek release under Zadvydas.[11] (Answer at 9.) Petitioner disputes that he failed to cooperate and requests an evidentiary hearing to resolve this factual dispute. (Reply at 5-8.) The Court finds that an evidentiary hearing is not required because, even taking Respondents' evidence as true, they have not shown a lack of cooperation that justifies denying Zimran relief.

Respondents rely on Pelich v. I.N.S., 329 F.3d 1057 (9th Cir. 2003), which held as follows:

> Although Pelich tries hard, he cannot squeeze his case into the confines of Zadvydas. There is significant evidence in the record that, unlike the detainees in Zadvydas, Pelich himself is responsible for his plight. Pelich has steadfastly refused to fill out a Polish passport application, which directly impedes Poland's ability to determine whether Pelich qualifies for Polish travel documents. In

---

[11] The undersigned assumes, without deciding, that this same argument can be made when the noncitizen's detention is governed by 8 C.F.R. § 241.13(i) rather than Zadvydas.

31

the January letter, the Polish consulate explicitly reserved its determination of Pelich's citizenship status pending review of the information requested in the letter, including the passport application. Compounding the dilemma is the fact that Pelich has provided the INS with conflicting information regarding his name, his parents' names, his parents' birthplaces and residences, his birthplace and his nationality.

… The risk of indefinite detention that motivated the Supreme Court's statutory interpretation in Zadvydas does not exist when an alien is the cause of his own detention. Unlike the aliens in Zadvydas, Pelich has the "keys[to his freedom] in his pocket" and could likely effectuate his removal by providing the information requested by the INS. … [T]he detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock.

Id. at 1059-60.

Here, Officer Chavez's declaration asserts that on July 17, 2025, August 29, 2025, and October 13, 2025—i.e., while Zimran was in custody—"DHS served Form I-229(a), a Warning for Failure to Depart the United States, on Zimran," which "required Zimran to submit passports (current and expired) to ICE, apply for a travel document/passport, submit to ICE birth certificates, national identification cards, and any other document indicating his citizenship, nationality, place of birth, and place of residence prior to entering the United States." (Chavez Decl. ¶ 18 / Dkt. 19-1 at 3.) Officer Chavez asserts that Zimran "has so far failed to take any of the foregoing steps." (Id.) Zimran acknowledges that he received these requests but declares, "I do[] not have a passport, birth certificate, national identification cards, or any other documents indicating my citizenship, nationality, place of birth, or place of residence before I entered the United States. Moreover, both my

parents are deceased." (Zimran Decl. ¶ 15(d) / Dkt. 20-1 at 6.) These representations are consistent with the fact Zimran entered the United States more than 25 years ago, when he was a minor. (See Chavez Decl. ¶ 6 / Dkt. 19-1 at 1 ("On or about February 13, 1999, Zimran entered the United States on a B-2 visitor visa."); Preciado Decl. Ex. B / Dkt. 19-2 at 13 (listing Zimran's age as 40)).)

Zimran also declares that he has never refused to submit a passport application, and in fact did so in 2020 or 2021, when he was detained by ICE in New York. (Zimran Decl. ¶ 15(f) / Dkt. 20-1 at 7.) He declares he has "never been given any paperwork or applications by ICE to submit to the [Pakistani] Consulate while [he has] been detained at Adelanto." (Id. ¶ 15(h).) Respondents do not identify any specific occasion on which Zimran failed to submit such an application or explain how they expected him to do so while in custody.[12]

This record is significantly different than in Pelich and the other cases cited by Respondents. (Answer at 9-10.)[13] In Lema v. I.N.S., 341 F.3d 853, 855 n.2-3 (9th Cir. 2003), the court found that the noncitizen affirmatively "misrepresented his nationality" when speaking with Ethiopian officials about travel documents,

---

[12] Respondents had an opportunity to respond to these allegations, as they were also made in Zimran's reply in support of his preliminary injunction motion, filed before Respondents' answer. (See Dkt. 12 at 38 (Marquis Decl. ¶ 5(q)).)

[13] Respondents also cite Khamseh v. Langill, No. 2:25-cv-09955-MCS-DTB (C.D. Cal. Nov. 6, 2025) as a case where the district court denied a temporary restraining order and the "record contained evidence that travel documents for petitioner's removal to Iran were requested on or about October 2, 2025 and petitioner was scheduled for a consulate interview on October 27, 2025, but he then refused to attend the interview." (Answer at 9.) Although the order noted the evidence of this refusal, lack of cooperation was not a basis for the court's ruling. The court found that the petitioner had been detained for less than five months, which meant his detention was "presumptively reasonable" under Zadvydas, and that the respondents had offered "thin" but "effectively uncontested" evidence "of efforts the United States has undertaken in the past month to effect Petitioner's removal to Iran." Khamseh, Dkt. 17 at 5-6.

causing those officials to decline to issue the documents. In <u>Montevosyan v. Warden, Desert View Annex Detention Facility</u>, No. 24-cv-1570-PA-DFM, 2025 WL 978153, at *6, 2025 U.S. Dist. LEXIS 32821, at *18 (C.D. Cal. Feb. 24, 2025), the noncitizen "admit[ted] [that] 'he [had] refused to comply with departure to Armenia,'" including by refusing to sign documents presented by ICE and sending letters to government officials attempting "to renounce his Armenian citizenship." Here, in contrast to those cases, the record does not support a finding that Zimran has taken any deliberate action to thwart DHS's efforts to obtain travel documents from Pakistan.[14]

### 4.     Respondents' Objections to the Initial R&R.

Respondents object that the initial R&R improperly "flips the evidentiary burden" imposed by <u>Zadvydas</u>, and they continue to assume that <u>Zadvydas</u> is the governing standard here. (Dkt. 25 at 9; <u>id.</u> at 15 ("Petitioner fails to show that his current detention is unreasonable pursuant to the Due Process standard delineated by the Supreme Court in <u>Zadvydas</u>….").) In <u>Zadvydas</u>, however, the noncitizen petitioners had never been released from custody on an OSUP. <u>See Zadvydas</u>, 533 U.S. at 684 ("The INS kept Zadvydas in custody after expiration of the removal period."); <u>id.</u> at 685 ("The 90-day removal period expired in early 1999, but the INS continued to keep Ma in custody"). As discussed above, courts have found that once a noncitizen is released on an OSUP, 8 C.F.R. § 241.13(i) applies and limits the government's power to re-detain them. <u>See Nguyen</u>, 788 F. Supp. 3d at 149); <u>Luu</u>, 2025 WL 3552298, at *6, 2025 U.S. Dist. LEXIS 257061, at *16; <u>Yan-Ling X.</u>, 2025 WL 3123793, at *3, 2025 U.S. Dist. LEXIS 220277, at *8.[15]

---

[14] To the extent Respondents wish to serve Zimran with such documents in the future, best practice would be to send a copy of any documents to his counsel.

[15] Multiple courts have also found that a "noncitizen released from custody pending removal proceedings … has a protected liberty interest in remaining out of custody" that is protected by the Fifth Amendment's Due Process Clause.

Respondents continue to assert that Zimran absconded in 2024 and conclusorily assert that he failed to cooperate with DHS's attempts to obtain travel documents.  (Dkt. 25 at 10-14.)  As discussed above, Zimran has submitted evidence to the contrary, including a written record showing that he checked in with ICE and a declaration explaining that he does not have further documents to submit to Pakistan.  As noted above, the Court does not need to resolve these disputed factual issues to find that Respondents have failed to meet their burden of demonstrating changed circumstances.

### D.   The Third Country Removal Claims Are Not Yet Ripe.

In Ground Three of the Petition, Zimran argued, "To the extent [his] detention in immigration custody is to effectuate his removal to a third country, that violates the Due Process Clause because … he has never had an opportunity to contest removal to any third country on the grounds that he may face persecution or torture if he is removed to that country."  (Pet. at 11-12.)  In Ground Four of the Petition, Zimran argues that his "[r]emoval to third countries where [he] might face imprisonment violates the constitutional prohibition on 'punitive' removal practices."  (Pet. at 12-13.)  Zimran does not explain how much or what type of notice he believes the Due Process Clause requires; he simply asks for release from custody.  (See Pet. at 14 (asking the Court to "order Respondents to release him from their custody"); Reply at 15 (asking for "the relief requested by the Petition").)

Calderon v. Kaiser, No. 25-cv-06695, 2025 WL 2430609, at *2, 2025 U.S. Dist. LEXIS 163975, at *5 (N.D. Cal. Aug. 22, 2025) (quoting Morrissey v. Brewer, 408 U.S. 471, 482 (1972)); Momtazian v. Noem, No. 5:25-cv-03432-AH-KES, 2025 U.S. Dist. LEXIS 266022, at *5-6 (C.D. Cal. Dec. 25, 2025); Guillermo M. R. v. Kaiser, 791 F. Supp. 3d 1021, 1029 (N.D. Cal. 2025) ("[I]ndividuals conditionally released from detention have a protected interest in their 'continued liberty.' … Like the individuals in Young, Morrissey, and Gagnon, Petitioner has a liberty interest in his continued release on bond.").

Officer Chavez's declaration states, "DHS intends to remove Zimran to Pakistan. As of November 10, 2025, it is my understanding that [the travel document request] remains pending for active consideration by the Pakistani authorities. Hence a request for removal to a third country has not been made." (Chavez Decl. ¶ 21 / Dkt. 10-1 at 3.) Based on this representation, Zimran did not address these claims in his preliminary injunction briefing, and the Court declined to consider them at that stage. (Dkt. 17 at 5 n.2.)

In Respondents' Answer, they argue it is "mere speculation" that Zimran "may be removed to a third country" and therefore "the issue is not ripe for resolution." (Answer at 6 n.1.) Petitioner's Reply argues that Zimran's conversation with Officer Preciado on December 17, 2025 indicates that Respondents may still seek to remove him to an unknown third country. (Reply at 4.) Zimran's declaration describes this conversation as follows:

> On December 17, 2025, I spoke to Deportation Officer J. Preciado about my 180-day custody review.[16] … [He] informed me that if I cannot be removed to Pakistan, ICE will explore a third country option near Pakistan for my removal. I asked DO Preciado which third country I would be removed to since Pakistan has not verified me as a Pakistani national. DO Preciado again informed me that DHS Headquarters would make a decision on whether to seek a third

---

[16] This appears to be the review required by 8 C.F.R. § 241.13, which states in relevant part, "If the Service has denied an alien's request for release under this section, the alien may submit a request for review of his or her detention under this section, six months after the Service's last denial of release under this section. After applying the procedures in this section, the HQPDU [Headquarters Post-order Detention Unit] shall consider any additional evidence provided by the alien or available to the Service as well as the evidence in the prior proceedings but the HQPDC shall render a de novo decision on the likelihood of removing the alien in the reasonably foreseeable future under the circumstances." 8 C.F.R. § 241.13(j).

country removal or to release me.  DO Preciado also told me that the petition I had filed could help.

(Zimran Decl. ¶ 15(j)-(k) / Dkt. 20-1 at 9.)  Respondents have not had an opportunity to respond to these allegations, as they were not included in Zimran's preliminary injunction briefing (which was completed in early December).

Even considering these allegations, Zimran has not shown that the third country removal claim is ripe at this time.  Compare Hassanzadeh v. Warden, No. 25-cv-2113-DMG-MAA, 2025 WL 3306272, at *5 n.6, 2025 U.S. Dist. LEXIS 234890, at *14 n.6 (C.D. Cal. Nov. 25, 2025) ("Hassanzadeh also asserts that Respondents may intend to remove him to a third country without appropriate procedures for him to argue that he is at risk in such a country, based on Respondent Noem's memorandum about third country removals. … Hassanzadeh has not come forward with evidence that Respondents intend to remove him to a third country, particularly in light of ICE's request for travel documents from the Iranian government. … Accordingly, Hassanzadeh does not demonstrate that relief related to the potential of removal to a third country is appropriate.").

Accordingly, these grounds should be denied without prejudice to Zimran filing a new habeas petition if he receives any indication that DHS is planning to remove him to a third country.

//

//

//

//

//

//

//

//

//

37

## V.      RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this R&R; (2) granting Grounds One and Two of the Petition; (3) dismissing Grounds Three and Four of the Petition as unripe; and (4) directing that (a) Zimran be immediately released from custody subject to the OSUP that governed his release prior to his June 2, 2025 detention, and (b) Respondents are enjoined and restrained from re-detaining Zimran unless and until they follow the procedures set forth in 8 C.F.R. §§ 241.4(*l*) and 241.13(i).

DATED:  January 14, 2026      _____

KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE